## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MICHAEL J. DUNKLE,**

        **Plaintiff,**

                                 **Civil Action 2:16-cv-240**
**vs.**                                 **JUDGE GEORGE C. SMITH**
                                     **Magistrate Judge Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

### OPINION AND ORDER

Plaintiff, Michael J. Dunkle, brings this action under 42 U.S.C. §§ 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply to the Opposition (ECF No. 16), and the administrative record (ECF No. 9). For the reasons that follow, the Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

### I.      BACKGROUND

Plaintiff filed his application for benefits on January 9, 2013, alleging that he has been disabled since January 1, 2000, due to depression, generalized anxiety disorder and sleep apnea. (R. at 94, 145). Plaintiff's application was denied initially and again upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law

Judge Ryan Glaze (the "ALJ") held a video hearing on July 10, 2014, at which Plaintiff, represented by counsel, appeared and testified. (R. at 32-70). Carl Hartong, a vocational expert, also appeared and testified at the hearing. (R. at 64–69). On November 10, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 12-27). On January 27, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-3). Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified at the administrative hearing that he had been living alone in a one bedroom apartment for about three months, after previously residing with his mother and stepfather. (R. at 39-40). Plaintiff testified that living alone had been an adjustment but he was managing thus far. He described his daily living activities in some detail: he spends quite a bit of time reading online (R. at 55); he generally gets around by walking, but will take the bus on specific occasions, for example, to go to the grocery store; he washes his clothes in the apartment building common room; and sometimes he visits the library to check out DVDs, which he watches at home. (R. at 41-42).

With respect to education and employment history, Plaintiff testified that he dropped out of college due to being overwhelmed by fear and anxiety, choosing instead to take a job with a friend's company because the work would involve less social interaction than school. (R. at 42). Plaintiff further testified that he worked for a third party collection agency in 2000, 2001 and 2002. While there, he performed well and was approved for the company's management track.

2

(R. at 43-44).  Plaintiff's father, however, had a heart attack during the duration of Plaintiff's employment at the collection agency, causing Plaintiff severe stress, resulting in a mental breakdown.  Plaintiff testified that, as a result, he was fired due to an outburst at work.  From that point on, Plaintiff has done subcontracting work, consisting of digital media and software assistance and computer hardware repair, but not had full-time employment.  (R. at 44).  He last performed subcontracting work in 2011.  (R. at 45).  Up until June or July of 2013, he also performed volunteer work, such as library management, music, video library management, and software consulting.  (R. at 46-47).

Plaintiff testified that he does not socialize much because most of his neighbors have mental health issues themselves and thoughts of leaving his apartment to have social interactions cause anxiety.  (R. at 41-42).  He explained that he has some professional friends and some personal friends but he does not feel particularly strong ties to the latter.  He stated that the only two places he goes to are the grocery store and library.  (R. at 48).  He also attends counseling services.  (R. at 49).  He visits his mother and her husband two or three times a month, by taking the bus and being picked up from the stop closest to them.  Sometimes they take him out to dinner.  (R. at 49).  He is not involved in any kinds of social organizations and does not attend church.  (*Id.*).

Plaintiff testified that he is unable to work due to panic attacks he suffers at least once per day.  (R. at 50).  The attacks last somewhere between thirty minutes to eight hours.  (R. at 51).  The physical symptoms that accompany his panic attacks include sweaty palms, a racing heart—making him fearful of a heart attack—stuttered and disoriented speech, and feeling like the room is expanding.  Mental symptoms of the attacks include fuzzy thoughts, feeling numb in the brain

3

and fear.  (R. at 51).  Plaintiff described the fear as an "overwhelming impression that I'm going to come to harm."  (*Id.*).  He also has "tendencies to harm [him]self during episodes after the fact" because he doesn't "want to go through these things again," as well as "how fearful of whatever [he] imagine[s] to be the threat that could get to [him.]"  (*Id.*).  Plaintiff testified that, sometimes when he speaks to people while he is having a panic attack, he misperceives the words they are saying or the emotions on their faces.  He believes people are lying to him, and mistakenly repeats words to them that they did not say.  (R. at 53).  Plaintiff cannot focus when experiencing an attack, his mind races and sounds are "so overwhelming" he is unable to block them out.  (R. at 56).  He is not able to read while suffering an attack because words blend together and do not register in his mind.  (R. at 57).

Plaintiff's doctor has prescribed hydroxyzine, with instructions to take an extra dose when he has a panic attack.  (R. at 51-52).  Plaintiff testified, however, that he was instructed to be somewhere where he can lay down or rest after taking the medication, which is "not functional" for him.  (R. at 52).  Plaintiff stated that he and his doctor are going to try to increase the dosage or Neurontin to see if that works better.  (*Id.*).

Plaintiff testified that he has sleep apnea which increases his issues with anxiety and reality awareness.  He has very vivid dreams and sometimes finds it difficult to distinguish whether he is remembering something from real life or from his dreams.  (R. at 54).

Plaintiff stated that he cannot work at the collection agency because he becomes "overwhelmed with any sort of interaction with people the more repetitive it is."  (R. at 57).  He is also unable to keep a normal workday schedule, because of the requirements of showing up at the same time every day and working eight hours in a row.  (R. at 58-59).  His attendance at

4

work suffers as a result of these issues and the only reason he has been able to perform freelance work is the ability it provides to set his own schedule. (R. at 59). Plaintiff testified that he loses two to three hours per day, for a total of about 20 hours per week of functionality due to his panic attacks, which includes the attacks themselves as well as time to calm down and physically rehabilitate himself. (R. at 60).

**B.     Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff previously held the job of a collector, which is a semi-skilled and lightly physically demanding position. (R. at 65).

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 65-66). Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that a similarly-situated hypothetical individual could not perform Plaintiff's past work, but could perform light to medium exertion, unskilled jobs in the national economy such as an a laboratory equipment cleaner, automobile detailer, and kitchen helper. (R. at 66). The VE also testified if Plaintiff was limited to work that is socially isolated with only occasional superficial interaction with supervisors, he could still perform work as a laboratory equipment cleaner, automobile detailer, and landscape specialist. (R. at 67).

The VE testified that Plaintiff could not maintain competitive employment if he was off task up to 20 percent of the workday or workweek. (R. at 75).

The VE also testified that an absence from work on a regular, continuous basis would result in the loss of each of the aforementioned jobs. (R. at 67-68).

5

### III.    MEDICAL RECORDS

**A.    Sherri Wongchaowart, M.D.**

Plaintiff began seeing Psychiatrist Sherri Wongchaowart, M.D., in November 2012 through a referral from Netcare after he conveyed thoughts of self-harm.  (R. at 227).   In December 2012, she diagnosed Plaintiff with mood disorder, post-traumatic stress disorder, major depression, adult deficit-hyperactive disorder, personality disorder, and sleep apnea. During the same visit, Dr. Wongchaowart assessed Plaintiff's GAF at 45.  (R. at 234).

Dr. Wongchaowart completed a Medical Assessment of Plaintiff's Ability to do Work-Related Activities pursuant to his mental health in April 2013.  She assessed his abilities to relate to co-workers and deal with the public as extremely limited due to his diagnoses.  She assessed his ability to use judgment and interact with supervisors as markedly limited.  (R. at 245).  She assessed his ability to understand, remember and carried out complex or detailed job instructions as mildly limited.  She assessed his ability to follow work rules, and to understand, remember and carry out simple job instructions, however, as not at all limited.  (R. at 245-46).  She also noted that he maintains his personal appearance and behaves in an emotionally stable manner without impairment.  (R. at 246).

Dr. Wongchaowart continued seeing Plaintiff for medical appointments approximately every one to three months beginning in November 2012.  (R. at 248).   In a January 2014 Mental Medical Source Statement, Dr. Wongchaowart recorded some improvement in Plaintiff's depression with medication therapy.  (*Id*.).  She assessed his mental status as "anxious" upon beginning his counseling interviews with "some difficulty focusing thoughts due to anxiety.  He is [however] able to be redirected and is usually calmer towards end of session."  Dr.

Wongchaowart's prognosis was "guarded/fair" with the Plaintiff in psychotherapy for treatment. (*Id*.).  She identified Plaintiff's symptoms as decreased energy, generalized persistent anxiety, and difficulty thinking or concentrating.  (R. at 249).  In assessing Plaintiff's mental abilities and aptitudes needed to do unskilled work, Dr. Wongchaowart indicated that he would have no difficulty in remembering work-like procedures; understanding, remembering and carrying out very short and simple instructions; maintaining punctual regular attendance in adherence to strict tolerances; sustaining an ordinary routine without special supervision; working in conditions with or proximity to others without being unduly distracted; making simple work-related decisions; performing at a consistent pace without an unreasonable number and length of rest periods; asking simple questions and requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers; responding appropriately to changes in a routine work setting and being aware of normal hazards and taking appropriate precautions.  In fact, the only prohibitions on Plaintiff's ability to do unskilled work were an inability to meet competitive standards with respect to maintaining attention for two hour segments; no ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and an inability to meet competitive standards in dealing with normal work stress.  Dr. Wongchaowart did opine that Plaintiff's anxiety would prevent him from tolerating a normal work week.  (R. at 250).  She further opined that Plaintiff would be absent from work more than four days per month due to his impairment and that his condition had lasted or was expected to last at least twelve months.  (R. at 253).

In a subsequent Medical Source Statement of Ability to do Work-Related Activities, dated May 27, 2014, Dr. Wongchaowart opined that, since at least November 2012, Plaintiff had

moderate limitations understanding, remembering and carrying out simple instructions.  Dr. Wongchaowart further assessed that Plaintiff had marked limitations understanding, remembering and carrying out complex instructions, as well as making judgments on complex work-related decisions.  She stated that Plaintiff had high anxiety and had difficult expressing thoughts while anxious.  (R. at 285).

**B.     Margaret G. Smith, Ph.D.**

Upon referral from Ohioans with Disabilities, Psychologist Dr. Margaret G. Smith, Ph.D., saw Plaintiff for a Psychological Evaluation on September 2, 2014, in which she assessed the presence or absence of a mental disorder and any resulting limitations in mental activities for work.  (R. at 289).  Dr. Smith diagnosed Plaintiff with panic disorder, unspecified depressive disorder, and unspecified personality disorder with cluster A and borderline traits and assigned a Global Assessment of Functioning score of 50.[1]  (R. at 294).

Dr. Smith concluded that Plaintiff's abilities in maintaining attention, concentration, persistence and pace prohibit him from performing work that requires multi-tasking.  She also found that he would have difficulty concentrating over long periods of time if he has to work around groups of people.  With respect to Plaintiff's abilities and limitations in responding appropriately to supervisors and to coworkers, Dr. Smith concluded that Plaintiff's paranoia may cause him to "misinterpret benign social cues and be easily provoked in a work setting."  (R. at 295).  Dr. Smith also concluded that "significant workplace pressures would provoke paranoia

---

[1] A GAF of 41 to 50 corresponds to serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).  DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th Ed. 2000).

and panic attacks" for Plaintiff.  For that reason, Plaintiff would only be able to work in socially isolated settings.  (R. at 295).

Dr. Smith completed a Medical Source Statement of Ability to do Work-Related Activities with respect to Plaintiff's mental health.  In the Statement, Dr. Smith assessed the levels at which Plaintiff's panic disorder, depression and personality disorder affected his ability to understand, remember and carry out instructions.  Plaintiff's abilities to understand, remember, and carry out simple instructions were assessed to be mildly affected.  Plaintiff's ability to make judgements on simple work-related decisions was assessed to be moderately affected.  Plaintiff's abilities to understand, remember, and carry out complex instructions were assessed to be markedly affected.  Finally, Plaintiff's ability to make judgments on complex work-related decisions was assessed to be extremely affected.  (R. at 296).

## C.      State Agency Doctors

On February 16, 2013, after review of Plaintiff's medical record, Robyn Hoffman, Ph.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace, but no repeated episodes of decompensation, each of extended duration.  (R. at 76).  She further determined that the evidence did not establish the presence of the "C" criteria.  (*Id*.).

On February 19, 2013, after review of Plaintiff's medical record, Olga V. Pylaeva, M.D., a state agency doctor, evaluated Plaintiff's RFC and opined that Plaintiff had moderate restrictions in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being

9

distracted by them; and make simple work-related decisions.  (R. at 77-78).  She further opined

that Plaintiff was not limited in his abilities to: carry out very short and simple instructions; and

accept instructions and respond appropriately to criticism from supervisors.  (*Id.*).  Dr. Pylaeva

concluded that Plaintiff "still retains the capacity for work that is simple or routine in nature with

tasks that remain reasonably static."  (*R.* at 78).  She also stated that Plaintiff "can adapt to

change in a stable work setting."  (R. at 79).

## IV.  THE ADMINISTRATIVE DECISION

On November 10, 2014, the ALJ issued his decision.  (R. at 12-27).  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since January 9, 2013, the application date.  (R. at 14).  The ALJ found that

Plaintiff had the severe impairments of depression, panic disorder, generalized anxiety disorder,

and social phobia.  (*Id.*).  He further found that Plaintiff did not have an impairment or

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 15).  At step four of the

sequential process, the ALJ set forth Plaintiff's RFC as follows:

> The undersigned finds that the claimant has the residual functional capacity to perform a
> full range of work at all exertional levels.  Mentally, the claimant retains the ability to
> understand, remember, and carry out simple instructions and make judgments on simple
> work and respond appropriately to usual work situations and changes in a routine work
> setting with few and expected changes.  Additionally, the claimant is limited to work that
> is socially isolated with only occasional superficial interaction with supervisors.

(R. at 18).  In reaching this determination, the ALJ gave "significant weight" to the opinion of

consulting psychologist Dr. Smith who opined that Plaintiff could only work in a socially

isolated setting and in a job that did not require multi-tasking.  (R. at 19).  The ALJ also accepted

the State Agency reviewing psychologists' assessments as "an accurate representation of the

claimant's mental status."  (*Id*.).  To that end, he accorded their assessments "significant weight,"

as they were consistent with the medical record in its entirety.  (*Id*.).  The ALJ, however,

ascribed "very little weight" to the opinions of Dr. Wongchaowart due to the following reasons:

(1) her opinions were "unsupported by her own treatment notes and mental status examinations,

which frequently show the claimant was alert and oriented, focused, and [exhibited] logical and

goal directed thought processes and content;" (2) her opinions are largely inconsistent with

Plaintiff's ability to perform daily living activities; and (3) her opinions were inconsistent with

those of Dr. Smith.  (R. at 20).  Additionally, the ALJ accorded "little weight" to the Plaintiff's

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

GAF score reflected in the record "as they are found to have very limited probative value in determining the claimant's actual functional limitations in this matter."  (R. at 20-21).

The ALJ found that "the record does not support the extent of claimant's subjective complaints regarding his mental limitations."  (R. at 23).  The ALJ noted that the record reflects Plaintiff's treatment has been generally effective in alleviating his symptoms and that Plaintiff has had significant gaps in his history of treatment.  (R. at 23-24.)  The ALJ found that Plaintiff's abilities to perform significant activities of daily living impugns his overall credibility.  (R. at 24).  The ALJ also found that the above RFC adequately accommodates the "location, duration, frequency and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors."  (R. at 25).

Relying on the VE's testimony, the ALJ concluded that Plaintiff is not able to perform past relevant work, but can perform the following jobs in the national economy: laboratory equipment cleaner, automobile detailer and landscape specialist.  (R. at 26).  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 27).

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  LEGAL ANALYSIS

In his Statement of Errors, Plaintiff argues that: (1) the ALJ erred in failing to properly weigh the medical opinion evidence of record by not according Dr. Wongchaowart's opinion controlling weight as well as according little probative weight to the GAF scores; (2) the ALJ's RFC assessment failed to take into account all of Plaintiff's opined limitations; and (3) the ALJ erred in finding Plaintiff did not equal Listing 12.04 or 12.06.

13

A.      The ALJ's Assessment of Medical Evidence on Record

1.      Opinion of Dr. Wongchaowart

Plaintiff contends that the ALJ erred in failing to accord Dr. Wongchaowart's opinions controlling weight.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

14

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec*., 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

The Court notes, as an initial matter, that the ALJ was quite specific in listing the reasons he accorded Dr. Wongchaowart's opinions very little weight, all of which were good reasons. Specifically, the ALJ stated that Dr. Wongchaowart's opinions were unsupported by her own treatment notes, were inconsistent with Plaintiff's activities of daily living and inconsistent with those of Dr. Smith. Plaintiff argues the ALJ erred in making each determination. The Court does not agree.

First, Dr. Wongchaowart's opinions are inconsistent with her treatment notes. For example, in April 2013, she assessed Plaintiff's ability to follow work rules, and to understand, remember and carry out simple job instructions as not at all limited. (R. 245-46). In January 2014, she again assessed Plaintiff's mental aptitudes as not limited in understanding, remembering and carrying out very short and simple instructions, maintaining punctual, regular work attendance, making simple work-related decisions and performing at a consistent pace without an unreasonable number and length of rest periods. (R. at 248). Finally, in May 2014, she assessed Plaintiff's limitations at understanding, remembering and carrying out simple instructions as "moderate." (R. at 285). These treatment notes are inconsistent with a finding

16

that the Plaintiff is unable to perform simple job duties.  An ALJ properly discounts an opinion of a treating physician that is not supported by his or her treatment notes in determining to accord less than controlling weight to the opinion.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (upholding the failure to accord a treating physician's opinion controlling weight if the physician's own diagnostic reports are unsupportive of petitioner's disability claim); 20 C.F.R. § 404.157(c)(2) and (3) (identifying "supportability" and "consistency" as relevant considerations).  As a result, the ALJ did not err in finding that Dr. Wongchaowart's own treatment notes support according her medical opinion very little weight.

Second, an ALJ does not commit reversible error in considering whether Plaintiff's activities of daily living are consistent with a disability determination.  *See Kinter v. Colvin*, No. 5:12-CV-490, 2013 WL 1878883, at *10 (N.D. Ohio Apr. 18, 2013) (upholding ALJ's decision not to credit treating physician's RFC opinion where the plaintiff's daily living activities were inconsistent with the treating physician's RFC assessment); *Walters* , 127 F.3d at 531 (ALJ may consider claimant's daily living activities in evaluating credibility).  Moreover, the ALJ's determinations in this regard are well-supported by the evidence.  At the administrative hearing, Plaintiff testified that he is able to live independently, sustaining all necessary elements of daily activity without assistance, such as grocery shopping, washing his clothes, going to the library, taking the bus, regularly attending his counseling appointments and even visiting family and going out to dinner on, at least, a monthly basis.  (R. at 39-42; 48-49).  The ALJ, therefore, did not err in finding that Plaintiff's activities of daily living are inconsistent with a determination of disability.

Third, the ALJ did not commit reversible error in assessing Dr. Wongchaowart's opinions as conflicting with those of Dr. Smith.  The Court finds that the medical records reveal material conflicts in the functional assessments performed by both doctors, such that the ALJ's interpretation of them as conflicting was reasonable.  Specifically, while Dr. Wongchaowart found "marked" impairments in Plaintiff's ability to make judgments on simple-work related decisions in May 2014, Dr. Smith found only "moderate" impairment.  (R. at 285; 296). Similarly, while Dr. Wongchaowart found that Plaintiff had "moderate" impairment in his abilities to understand, remember and carry out simple instructions, Dr. Smith found "mild" impairment in the same.  (*Id.*)  Thus, while both doctors found that Plaintiff exhibited "marked" or "extreme" limitations related to abilities to comprehend and carry out complex instructions, the difference between "moderate" and "marked" impairments in understanding and carrying out simple work-related decisions and instructions is significant because "moderate" impairments are not consistent with a finding of disability.  *See Sims v. Comm'r of Soc.*, 406 F. App'x 977, 982 (6th Cir. 2011) (moderate functional limitations not supportive of disability).

Moreover, even if the ALJ's determination that the opinions are conflicting was error, it was harmless because it would not affect the outcome.  The ALJ's assessment that a treating physician's conclusions were "not well supported by the overall evidence of record and [were] inconsistent with other medical evidence of record" is sufficient reason to not accord controlling weight to the treating physician.  *West v. Comm'r of Soc. Sec.*, No. 2:13-cv-08, 2014 WL 93455, at *8 (S.D. Ohio Mar. 10, 2014) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).

## 2. Weight accorded to GAF Score

Plaintiff additionally asserts that the ALJ erred in according the Plaintiff's GAF scores little weight. The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF of 41 to 50 corresponds to serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th Ed. 2000).

A GAF score represents a "snapshot" of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Comm'r*, 61 F. App'x 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at 32–34. "As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis." *Arnold v. Astrue*, No. 10-cv-13, 2010 WL 5812957, at *8 (S.D. Ohio Oct. 7, 2010). For this reason, the ALJ's decision not to credit Plaintiff's GAF scores in formulating Plaintiff's RFC is appropriate given the ALJ's observation that they have little value in determining mental work activity capability. Further, "the Commissioner has declined to endorse the GAF score for use in the Social Security and SSI disability programs, and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007) (internal quotation marks and citations omitted).

For the above-mentioned reasons, the Court finds that the ALJ did not commit reversible error in his assessments of the medical evidence on record by failing to accord either a treating physician, or the GAF sufficient weight.

**B.     Residual Functional Capacity Assessment**

With his second contention of error, Plaintiff asserts that the ALJ erred in his assessment of Plaintiff's RFC by failing to account for all of Plaintiff's opined limitations.  Specifically, Plaintiff asserts that the ALJ failed to account for specific limitations from the state agency psychologists' assessments, a medical source to which the ALJ accorded significant weight. Plaintiff also asserts that the RFC is internally inconsistent with respect to the Plaintiff's ability to engage in social interactions.  The Court is not persuaded by Plaintiff's RFC contentions.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

20

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

With respect to the interpretation of the state agency psychologists' opinions, Plaintiff focuses on the ALJ's summation that they limited the Plaintiff to work settings "where changes are both explained and demonstrated."  (R. at 19).  Plaintiff claims that the ALJ then erred in not including this limitation in his RFC, which instead reads that Plaintiff is able to "respond appropriately to usual work situations and changes in a routine work setting with few and expected changes."  (R. at 18).

First, the Court is not convinced that the evidence supports Plaintiff's assertion that the state agency psychologists found he was limited to an environment where changes are both demonstrated and explained.  In fact, Dr. Pylaeva specifically stated that Plaintiff is able to adapt to change in a work setting.  (R. at 79).  Moreover, the Court is not convinced that the ALJ's summation of the state agency psychologist's findings is actually inconsistent with the RFC determination.  The RFC states that Plaintiff is capable of responding appropriately to "changes in a routine work setting *with few and expected changes*."  (R. at 18) (emphasis added).  That

21

language is consistent with representing that Plaintiff is limited to an environment where changes are demonstrated and explained.

Second, fatal to Plaintiff's argument, is the fact that, even crediting Plaintiff's interpretation, a limitation to work settings where changes are few and explained would not entitle Plaintiff to benefits.  To that end, the vocational expert testified that if Plaintiff was limited to work that is socially isolated with only occasional and superficial interaction with supervisors, he could still perform jobs in the national economy—namely laboratory equipment cleaner, automobile detailer, and landscape specialist.  (R. at 67).  Thus, any error committed by the ALJ in failing to include a sufficient limitation on unexpected changes in the work setting in the RFC was harmless.  *See Rabbers*, 582 F.3d at 651.

### C.    ALJ's Findings Related to Listing 12.04 and 12.06

In determining whether a claimant is disabled, an ALJ must consider whether the claimant's impairments meet Social Security Listing requirements.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "At step three of the evaluation process, it is the burden of the claimant to show that he [or she] meets or equals the listed impairment."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004).  Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Id.* at 728.

The United States Court of Appeals for the Sixth Circuit has emphasized that there is no "heightened articulation standard" in considering the listing impairments.  *Bledsoe*, 165 F. App'x

22

at 411 (holding that an ALJ is not obligated to "spell[] out every consideration that went into the step three determination"). Instead, the Court reviews whether substantial evidence supports the ALJ's findings. *See id.* The Sixth Circuit has held, however, that an ALJ's decision must contain sufficient analysis to allow for meaningful judicial review of the listing impairment decision. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (remanding where "[n]o analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing under section 1.00"). In remanding for a lack of analysis, the *Reynolds* Court emphasized that it was "possible that the evidence [the claimant] put forth could meet" Listing 1.04. *Id.* at 416.

Another district court has recognized that the requirements for an ALJ's listing impairment analysis are "[not] so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three . . . ." *Staggs v. Astrue*, No. 2:09–cv–00097, 2011 WL 3444014, at *4 (M.D. Tenn. Aug. 8, 2011). Rather, the Sixth Circuit has implicitly acknowledged that a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis. *See Bledsoe*, 165 F. App'x at 411 (finding that an ALJ appropriately considered a claimant's combined impairments at step three in part because "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings"). Various federal courts have acknowledged that other portions of an ALJ's decision may justify his or her step-three conclusions. *See, e.g.*, *Smith v. Astrue*, No. 11–1574, 2011 WL 6188731, at *1 (4th Cir. Dec. 14, 2011) (using an "ALJ's analysis at subsequent steps of the evaluation" to find that substantial

23

evidence supported the step-three determination); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (holding that an ALJ's findings at step four and five precluded a claimant from qualifying for a listing under step three).

Listing 12.04 concerns affective disorders and is met when a claimant has a mood disturbance, accompanied by a full or partial manic depressive syndrome. 20 C.F.R. Part 404 Subpt. P, App. 1 § 12.04. In order to satisfy the Listing 12.04, a claimant must fulfill requirements laid out in paragraphs A and B or in C. Likewise, Listing 12.06 concerns anxiety related disorders, if the claimant's anxiety is the predominant disturbance. 20 C.F.R. Part 404 Subpt. P, App. 1 § 12.06. The listing also requires identical criteria in paragraphs A and B to be met or the criteria in paragraphs A and C. Here, the ALJ found that Plaintiff met the requirements of paragraph A. Plaintiff contends, in his third and final assignment of error, that the ALJ improperly evaluated whether he also met the requirements of paragraph B. In relevant part, Listing 12.04 provided as follows: [3]

> Affected Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . . .
>
>            \*\*\*
>
> B. Resulting in at least two of the following:
>
>     1. Marked restriction of activities of daily living; or
>     2. Marked difficulties in maintaining social functioning; or

---

[3] In January 2017, the language of Listing 12.05 was amended, as applicable to social security cases with application filing dates beyond the date of the amendments.

> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Part 404 Subpt. P, App. 1 § 12.04.

The ALJ found that Plaintiff had marked difficulties in social functioning.  (R. at 16).  No medical evidence in the record indicated, and Plaintiff does not now claim, he suffered from repeated episodes of decompensation.  The ALJ also determined that Plaintiff does not have marked difficulties in activities of daily living or in maintaining concentration, persistence, or pace.  (R. at 16-17).

The Court does not agree the ALJ's determinations constituted reversible error because the Plaintiff has failed to meet his burden of presenting specific medical findings in satisfaction of the listing descriptions.  *Thacker*, 93 F. App'x at 727–28.  Plaintiff simply states that the ALJ's determination was a "standard conclusory sentence" that "does not amount to a meaningful discussion or review of whether [Plaintiff] equaled the listings."  (ECF No. 10, at 18).  In contradistinction to this assertion, the ALJ provided a detailed analysis of whether Plaintiff had marked limitations in social functioning or in concentration, persistence or pace, which considered the totality of the evidence in the record with respect to both.  (R. at 16-17).  As detailed above, Plaintiff himself testified that he is able to engage in substantial activities of daily living.

Moreover, the ALJ pointed to record evidence, including the Plaintiff's own testimony, that he was able to "sustain focus, attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in both the household and work settings."  (R. at 16).  Other record evidence of a lack of marked limitation in concentration,

persistence or pace include Dr. Smith's evaluation which stated only that Plaintiff's limitations in those areas would prohibit him from work that involves multi-tasking (R. at 295), and the state agency psychologist assessment that Plaintiff suffered from only "moderate" limitations in the same (R. at 76).  Plaintiff has failed to identify specific medical evidence in the record that reasonably contradicts the record evidence of a lack of the requisite marked limitations.  As a result, the Court finds that the ALJ did not err in his assessment that neither Listing 12.04 nor Listing 12.06 dictates a disability determination in this case.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, the Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED**.

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**